Trenton R. Kashima (SBN No. 291405)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

*Attorneys for Plaintiffs and the Class*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAKEMA TATE and RICHARD ORTIZ individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | **PLAINTIFFS' CLASS ACTION COMPLAINT** |
| v. | |
| WM. BOLTHOUSE FARMS, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

COMPLAINT

Plaintiffs Lakema Tate and Richard Ortiz ("Plaintiffs") bring this Class Action Complaint against Defendant Wm. Bolthouse Farms, Inc. ("Defendant" or "Bolthouse") individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE ACTION

1.      Plaintiffs bring this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's Bolthouse Farms-branded Green Goodness Fruit Juice Smoothie, Amazing Mango Fruit Juice Smoothie, Blue Goddess Fruit Juice Smoothie, C-Boost Fruit Juice Smoothie, and Berry Superfood Boost (the "Products"[1]), which is prominently labeled and marketed as a nutritious, healthy "100% Fruit Juice Smoothie," when, in fact, Plaintiffs' testing has revealed that the Products contain per- and polyfluoralkyl substances ("PFAS"), a category of synthetic chemicals that are, by definition, artificial.

2.      PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[2]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

---

[1] As alleged herein, Defendant conceals the presence of PFAS in the Products. Accordingly, discovery will reveal the exhaustive list of substantially similar products that are included in this action.
[2] https://pubs.acs.org/doi/10.1021/acs.est.1c06990 (last accessed February 24, 2023).
[3]      https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last accessed February 24, 2023).

COMPLAINT

4.      Defendant formulates, manufactures, markets, and sells the Products, which they uniformly represent as a nutritious "100% Fruit Juice Smoothie," with "no added sugar" [4] and "2 ¾, 3 ¼, or  3 ¾  servings of fruits."[5]

5.      Defendant has engaged in pervasive marketing efforts to convince consumers that the Product is a healthy, natural fruit juice beverage.

6.       As one of the leading players in the premium chilled beverages market, Defendant knows the importance of marketing and labeling, including the value of the label representations they carefully choose for placement on the Products. Accordingly, Defendant's representations are designed to set its Products apart from the litany of competitors in this space.

7.      However, despite Defendant's consistent and pervasive marketing representations to consumers that their Products are a healthy "100% Fruit Juice Smoothie" that is free from any artificial ingredients, Plaintiffs' independent testing has determined that the Product actually contains PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

8.      The presence of PFAS is entirely inconsistent with Defendant's uniform representations.

9.      As a result of Defendant's misconduct, Plaintiffs and putative Class Members have suffered injury in fact, including economic damages.

10.     Accordingly, Plaintiffs bring this suit to halt Defendant's dissemination of false and misleading representations and to correct the false and misleading perceptions that Defendant's representations have created in the minds of reasonable consumers.

11.     Plaintiffs seek damages, injunctive relief, and other equitable remedies for themselves and for the proposed classes.

## PARTIES

12.     Plaintiff Lakema Tate is a resident of Los Angeles, Los Angeles County, and was

---

[4] The C-Boost does not contain this representation.
[5] The Products range in servings of fruit they provide from 2 ¾, 3 ¼, or 3 ¾.

- 2 -

at all times relevant hereto, a citizen of California.

13.     Plaintiff Richard Ortiz is a resident of Bensenville, Illinois, and was, at all times relevant hereto, a citizen of Illinois.

14.     Defendant Wm. Bolthouse Farms, Inc. is a corporation organized under the laws of Delaware with its corporate headquarters located at 7200 E Brundage Ln, Bakersfield, California. At all times relevant to this action, Defendant maintained authority and control over the marketing representations of Bolthouse Farms-branded products, including the Product at issue here.

## JURISDCTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because a Plaintiff and Defendant are citizens of different states.

16.     This Court has personal jurisdiction over the Defendant because they maintain their corporate headquarters in this State, transact business in this State and District, have substantial aggregate contacts with this State and District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in this State and District, and because they purposefully availed themselves of the laws of the State of California, and further because a Plaintiff Tate purchased the Products in this State and District. Further, Defendant is headquartered in this District.

17.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendant is headquartered in this District.

## FACTUAL ALLEGATIONS

### Defendant's Business

18.     Bolthouse Farms was first founded in 1915 and gained its reputation as the leading producer and supplier of carrots before eventually expanding its business to include, among other things, Bolthouse Farms-branded super-premium juices and smoothies.

- 3 -

COMPLAINT

19.     In their own words, Defendant is guided by the vision "Plants Powering People."[6]

20.     In an already crowded market, there is enormous incentive for companies such as Defendant to cultivate a wellness-minded corporate image and market their products as safe, healthy and natural.

21.     In order to capitalize on this consumer demand, Bolthouse Farms products are aggressively marketed to health-focused consumers and rely on the company's health-conscious legacy to convince consumers that the products are natural and wholesome.

22.     Defendant sells Bolthouse Farms products at mass market retailers and grocery stores throughout the United States, including Walmart, Target, Whole Foods, Harris Teeter, and CVS.

***Defendant's False and Deceptive Nutrition Representations***

23.     Bolthouse Farms Green Goodness is a ready-to-drink, refrigerated juice that is uniformly represented as a healthy "100% Fruit Juice Smoothie"[7] with various nutritional benefits, including claims that the Products have "no sugar added," is a good source of antioxidants and vitamins, and includes various healthy ingredients, including nearly 3 servings of fruit per bottle (the "Nutrition Representations").

24.     The Products' front label informs consumers that the bottle contains between "2 ¾ servings of fruit," which meets—or even exceeds--the U.S.D.A. recommended daily intake of fruit for most Americans.[8] Fruit is well-known to provide a variety of nutrients that are important for overall health.

25.     For example, the Green Goodness label that the Product is a "good source of Antioxidant C & Vitamin B12."

---

[6]   https://www.producemarketguide.com/company/106217/wm-bolthouse-farms-inc-hq  (last visited February 24, 2023).
[7]     https://www.walmart.com/ip/Bolthouse-Farms-Green-Goodness-11-oz/46095281     (last visited February 24, 2023).
[8] https://www.myplate.gov/eat-healthy/fruits (last visited February 24, 2023).

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Antioxidant C, also known as Vitamin C, helps protect cells against the effects of free radicals, which may play a role in hearth disease, cancer, and other diseases.[9] Likewise, Vitamin B12 also has health benefits as it plays an essential role in red blood cell formation, cell metabolism, nerve function, and the production of DNA.[10]

---

[9]   https://www.mayoclinic.org/drugs-supplements-vitamin-c/art-20363932 (last visited February 24, 2023).

[10]   https://www.mayoclinic.org/drugs-supplements-vitamin-b12/art-20363663 (last visited February 24, 2023).

COMPLAINT

26.    On the Products' left side label, it represents that consumers can "Feel Good"



about what's in the bottle and includes pictures of the various fruits included in the Products. Nothing about these images would lead consumers to believe that the Products contain any harmful chemicals.[11]

27.    The label also includes a list of other ingredients included in the Products, including various vegetables, minerals, and vitamins. These "other ingredients" are largely associated with optimizing health[12], and are intentionally added and prominently advertised on the label in order to convince consumers that the Products have nutritional and wellness benefits.

/ / /

/ / /

/ / /

---

[11] *Id.*

[12] *See, e.g.,* "7 Evidence-Based Benefits of Wheatgrass," https://www.healthline.com/nutrition/wheatgrass-benefits (last visited February 24, 2023); "10 Health Benefits of Spirulina," https://www.healthline.com/nutrition/10-proven-benefits-of-spirulina (last visited February 24, 2023); "9 Surprising Benefits of Dulse," https://www.organicfacts.net/health-benefits/other/dulse.html (last visited February 24, 2023)

COMPLAINT

## AND THESE INGREDIENTS:

| | | | |
|---|---|---|---|
| Spirulina | 980mg | Jerusalem Artichoke | <1mg |
| Green Tea | 56mg | Nova Scotia Dulse | 6mcg |
| Broccoli | 54mg | Iron | 1.1mg |
| Spinach | 54mg | Manganese | 2.7mg |
| Barley Grass | 40mg | Vitamin B6 | 0.20mg |
| Wheatgrass | 40mg | Vitamin B12 | 1.02mcg |
| Garlic | <1mg | Vitamin C | 12mg |

The Product's label further claims the Products has "No Sugar Added."[13]



### Defendant's Other False and Deceptive Advertising

28.    Even beyond the Nutrition Representations described herein, Defendant makes various other representations about the Product designed to convince reasonable consumers that the Product is a safe and healthy choice for consumers and to further bolster its Nutrition

---

[13] The C-Boost does not contain the "No Sugar Added" representation.

COMPLAINT

Representations.

29.     The Bolthouse Farms brand name and logo are designed to evoke images of nature, farmland, and fresh produce.



30.     Even the name of one of  the Products themselves, which intentionally joins the words "Green" and "Goodness," is designed to convince reasonable consumers that the Products are good, healthy, natural.

31.     The Bolthouse Farms website further touts the "goodness" of the Products, including the fact that is free of numerous questionable ingredients, such artificial preservatives, colors, flavors. These claims are designed to instill trust in consumers that the Products are, in fact, a natural and healthy juice beverage.

32.     Defendant is well aware of consumer demand for products that are clean and natural, which is evidenced by its purported commitment to "Transparency," which is found on its website[14]:

/ / /

/ / /

/ / /

_____

[14] https://www.bolthouse.com/product/green-goodness/ (last visited February 24, 2023).

COMPLAINT

**TRANSPARENCY**

We've promised to use fewer ingredients that people don't want. And more of the ones they do.

The ingredients used in Green Goodness® are not from genetically modified crops.

33.     Defendant even promises that the ingredients used in the Products do not come from genetically modified crops.

34.     Defendant has recently introduced new packaging which doubles down on its previous marketing claims by including the phrase "Feel Good Nutrition."[15]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

_____

[15]   https://www.instagram.com/reel/CkrXl3ep-qq/?igshid=YTY2NzY3YTc=   (last   visited February 24, 2023).

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21
22
23
24
25
26
27
28

35.     Defendant's changes to its packaging were meant to embody "all the bountiful goodness on the inside," which includes "loads of thoughtful ingredients."[16]

36.     Consumers reasonably and fairly understand "nutrition" as the food necessary for human health and growth.[17] No reasonable consumer would consider a juice drink containing chemicals which have been conclusively linked to negative health effects "nutrition."

---

[16] www.bolthouse.com/freshlook (last visited February 24, 2023).
[17] https://medlineplus.gov/definitions/nutritiondefinitions.html (last visited February 24, 2023).

COMPLAINT

37.     This new packaging was introduced to consumers in December, and based on information and belief, both the new packaging and its prior iteration are currently being distributed to consumers.

38.     Nowhere on the Products' packaging, or in any of its marketing representations, does Defendant disclose the presence of PFAS—or any other synthetic chemical—in the Products.

39.     It is undeniable that the Products are uniformly represented across all marketing channels-- including the Products' packaging, where it cannot be missed by consumers -- as a healthy, nutritious juice drink that is free from any concerning ingredients.

***PFAS Chemicals and Associated Risks***

40.     PFAS are a category of highly persistent and potentially harmful <u>man-made chemicals</u>, which include Perfluorooctanoic acid ("PFOA") and Perfluorooctanesulfonic acid ( PFOS").[18]

41.     PFAS are <u>not naturally occurring</u>.[19] They were first developed by scientists in the 1940s.[20] Thus, they are indisputably "artificial".

42.     The man-made PFAS chemicals, which are in the Products, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

43.     PFOS in particular is well-known to negatively impact the human body and the environment.

44.     Given the deleterious effects of PFOS on the body and environment, it is one of the most commonly studied[21] and commonly regulated.

45.     A November 2012 research report titled "Durable Water and Soil Repellent

---

[18] https://www.epa.gov/pfas/pfas-explained (last visited February 24, 2023).
[19] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (last visited February 24, 2023).
[20] https://www.epa.gov/chemical-research/research-and-polyfluoroalkyl-substances-pfas (last visited February 24, 2023).
[21] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (last visited February 24, 2023).

COMPLAINT

Chemistry in the Textile Industry"[22] explained:

> PFOA and PFOS, the most widely known and studied long-chain PFAAs, have been shown to be persistent in the environment, have long elimination half-life in wildlife and humans, and have toxicological properties of concern. Due to these properties, regulatory actions have been put in place or are being considered in several countries to manage these substances.

46.     PFAS are a source of concern, due to various widespread environmental presence, bio-accumulative properties, extreme persistence and evidence of adverse health effects.[23]

47.     Consequently, the recognition of these hazardous properties and global distribution has led the scientific, regulatory and industrial communities to engage in international efforts to curb the production and uses of PFAS.[24]

48.     Importantly, PFOS and PFOA have been phased out of production[25] since the early 2000s, and *prohibited from manufacture and most uses in European Union countries since 2008* (Directive 2006/122/EC)."[26]

49.     Diet is considered a major route of PFAS exposure for humans, and reasonable consumers purchasing the Products represented as a nutritious and healthy 100% juice drink would not expect it to contain harmful man-made chemicals, such as PFAS.[27]

50.     The Environmental Protection Agency ("EPA") has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:"[28]

a.   Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

---

[22] https://uploads-ssl.webflow.com/5c4065f2d6b53e08a1b03de7/5db6eece578efb688bee2bed_DWR_Report.pdf (last visited February 24, 2023).
[23]   https://www.sciencedirect.com/science/article/abs/pii/S0960852421011494   (last   visited February 24, 2023).
[24] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8536021/ (last visited February 24, 2023).
[25] *Id.*
[26]   https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32006L0122   (last   visited February 24, 2023).
[27] https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (last visited February 24, 2023).
[28]     https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited February 24, 2023).

b.  Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

c.  Increased risk of some cancers, including prostate, kidney, and testicular cancers.

d.  Reduced ability of the body's immune system to fight infections, including

e.  reduced vaccine response.

f.  Interference with the body's natural hormones.

g.  Increased cholesterol levels and/or risk of obesity.

51.  A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[29]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[29] https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (last visited February 24, 2023).

- 13 -



52.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[30]

53.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood development:[31]

54.     Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of

---

[30] *Id.*
[31]     https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html (last visited February 24, 2023).

COMPLAINT

the body's most critical functions: metabolism and immunity.[32]

55.     According to the EPA, limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[33]

56.     There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[34]

57.     Defendant is well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Products are free from artificial ingredients like PFAS.

58.     Defendant has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Products are superior to other products that are not free from "artificial flavors" or do not have the same purported health benefits.

59.     Reasonable consumers purchasing the Products would believe, based on Defendant's representations, that the Products do not contain artificial, synthetic or man-made chemicals that could adversely impact their health.

***Plaintiffs' Independent Testing Confirms the Presence of PFAS Chemicals in the Product***

60.     Plaintiffs sought independent third-party testing to determine whether the Products contained PFAS chemicals. Plaintiffs' independent testing was completed on February 22, 2023.

61.     Plaintiffs' independent testing was conducted in accordance with accepted industry standards for detecting the presence of PFAS and includes flavors purchased by Plaintiffs.

---

[32] *Id.*

[33]  https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (last visited February 24, 2023).

[34]  https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure (last visited February 24, 2023).

62.     Plaintiffs' testing detected material levels of PFAS in the Product, including significant levels of 1H, 1H, 2H, 2H-perfluorooctane sulfonic acid ("6:2FTS"), Perfluorohexanesulfonic acid ("PFHxS"), and Perfluorooctanesulfonic acid ("PFOS").

63.     Thus, Defendant's Product exposes hundreds of thousands of unsuspecting consumers to toxic synthetic chemicals in direct contradiction to their uniform label claims.

64.     While the EPA has not yet established guidance for the presence of 6:2FTS and PFHxS in drinking water, it recently confirmed that the levels at which negative health effects could occur from exposure to certain PFAS chemicals is much lower than previously understood– including near zero in some cases.[35]

65.     In fact, the EPA recently tightened its lifetime health advisory levels for PFOA and PFOS exposure in drinking water. For PFOS, the recommendation is 0.02 ppt.[36]

66.     The amount of PFOS found within the Product from Plaintiffs' testing is approximately **95 times** the recommended lifetime health advisory for drinking water.

**Defendant's Unlawful Conduct**

67.     At all times relevant to this action, Defendant knew, or at minimum should have known, that its Product contains PFAS.

68.     To capitalize on increasing consumer demand for products designed to promote health and wellness, including those free from harmful artificial ingredients like PFAS, Defendant has knowingly and willfully deployed a concerted strategy to distinguish its Product from competing options in the highly competitive juice and smoothie industry by representing its Product using the Nutrition Representations and other misrepresentations and omissions as described herein.

69.     Throughout the class period, Defendant has targeted health-conscious consumers by falsely and misleadingly representing its Product as healthy, natural, "good" juice smoothie that is full of fruits and other nutritious ingredients and free from artificial ingredients and added

---

[35] *Id.*

[36] *Id.*

sugar. Consequently, reasonable consumers believe the Product is free from artificial, man-made chemicals known to harm human health.

70.      Defendant is well-aware that consumers are increasingly demanding beverage options that support their wellness goals, and has furthermore, Defendant has found success by cultivating a health-focused image over its more than 100 years in the food industry.

71.      Defendant's wellness-focused business strategy is supported by current market research. According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[37]  Consumers ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[38]

72.      At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[39]

73.      These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[40]

74.      Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[41]

---

[37]      https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among-consumers/ (last visited February 24, 2023).
[38]  *Id.*
[39]      https://cdn.shopify.com/s/files/1/0612/4493/2266/files/MADE_SAFE_What-Shoppers-Want_Survey.pdf?v=1669140340 (last visited February 24, 2023).
[40]      https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-the-game-for-food-beverage-processors/ (last visited February 24, 2023).
[41]      https://cdn.shopify.com/s/files/1/0612/4493/2266/files/MADE_SAFE_What-Shoppers-Want_Survey.pdf?v=1669140340 (last visited February 24, 2023).

75. Therefore, current research demonstrates, and Defendant's marketing strategy supports, that the presence of harmful chemicals in food, beverages, and their packaging is material to reasonable consumers.

76. Defendant's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell beverages which do not contain artificial ingredients, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Products.

77. Consumers lack the expertise to ascertain the true ingredients in the Products prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendant to accurately and honestly advertise its Products' ingredients and health benefits. Further, consumers rely on Defendant to not contradict those representations by using artificial man-made chemicals in its Products that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

78. Defendant's misleading Nutrition Representations, along with the other representations described herein, are false because products containing toxic, man-made ingredients like PFAS renders the Products not healthy or nutritious by definition.

79. Defendant's representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiffs and Class members, regarding the presence of PFAS chemicals in its Products. Accordingly, these acts and practices by Defendant are deceptive.

80. Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Products would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

81. Defendant's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Products worthless or less valuable. Indeed, Defendant, as the manufacturer of the Products, determines the ingredients contained therein, as well as all quality control processes. Defendant should, and can, control for the PFAS chemicals which are contained in its Products.

82. There are steps that Defendant can take to reduce or eliminate PFAS chemicals in

- 18 -

the Products.  As the EPA notes,

> Certain technologies have been found to remove PFAS from drinking water, especially Perfluorooctanoic acid (PFOA) and Perfluorooctanesulfonic acid (PFOS), which are the most studied of these chemicals. Those technologies include activated carbon adsorption, ion exchange resins, and high-pressure membranes. These technologies can be used in drinking water treatment facilities, in water systems in hospitals or individual buildings, or even in homes at the point-of-entry, where water enters the home, or the point-of-use, such as in a kitchen sink or a shower.[42]

Additionally, studies show that UV lights can be used to degrade or eliminate PFAS chemicals. When combined with testing and processes to controls to prevent the introduction of PFAS chemicals, these methods can drastically limit the PFAS chemicals in the Products.  Yet, Defendant does not undertake these mitigation efforts and does not disclose the level of PFAS chemicals in the Products.

83.     If Defendant had disclosed to Plaintiffs and putative Class Members that its Products contained PFAS chemicals, Plaintiffs and putative Class Members would not have purchased Defendant's Products or they would have paid less for them.

84.     Plaintiffs and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

85.     Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

86.     The materiality of the representations described herein also establishes causation between Defendant's conduct and the injuries Plaintiffs and the Class Members sustained.

87.     Defendant is aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Products using the health-focused Nutrition Representations and other representations described herein in order to profit off of unsuspecting consumers, including Plaintiffs and Class Members.

---

[42] https://www.epa.gov/sciencematters/reducing-pfas-drinking-water-treatment-technologies (last visited July 10, 2023).

88.     The presence of PFAS chemicals in Defendant's Products are entirely inconsistent with its uniform representations.

89.     Defendant's knowingly false and misleading representations have the intended result of convincing reasonable consumers that its Products are without chemical or artificial ingredients and therefore do not contain synthetic, man-made, toxic chemicals. No reasonable consumer would consider Defendant's Products as being a healthy, natural, nutritious juice smoothie if they knew that the Products contained harmful, artificial PFAS chemicals.

90.     Defendant's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiffs and Class Members.

91.     In making the false, misleading, and deceptive representations, Defendant knew and intended consumers would pay a premium for the Products over comparable products that are made from or contain synthetic or artificial ingredients.

92.     Plaintiffs and Class Members all paid money for the Products, however, they did not obtain the full value of the advertised Products due to Defendant's misrepresentations as detailed herein. Plaintiffs and Class Members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products' artificial, man-made, and harmful ingredients. Thus, Plaintiffs and Class Members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

93.     Defendant's widespread marketing campaign portraying the Products as containing only healthy and natural ingredients as detailed herein, is misleading and deceptive to consumers because the Products are made with artificial, man-made, and toxic ingredients. Plaintiffs bring this action on behalf of the proposed Classes to stop Defendant's misleading practices.

### PFAS Renders the Products Adulterated, Misbranded and Illegal to Sell

94.     The Products are used as a drink for humans and are therefore a "food" which is regulated by the U.S. Food and Drug Administration. *See* 21 U.S.C. § 321(f).

95.     The Federal Food, Drug & Cosmetic Act ("FDCA") establishes numerous

- 20 -

regulations regarding the safety of food which is sold to consumers, including by creating various labeling requirements.

96.     Under the FDCA, a food is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to health." *See* 21 U.S.C. § 342(a)(1). Even in the event that a poisonous or deleterious substance is not an "added" substance (such as in the case of unintended contamination), food is still deemed adulterated if the quantity of the substance renders it injurious to health. *Id*.

97.     As detailed herein, PFAS, and specifically PFOS found in Defendant's Products, are indisputably linked to negative health consequences and is therefore a "poisonous or deleterious substance."

98.     Furthermore, PFOS was discovered in Defendant's Products at levels that are more than 200 times the EPA's recommended limit for drinking water, which supports a finding that even if the PFOS are present due to contamination, it is still present in the Product at levels that are injurious to health.

99.     The FDA has not established any tolerances for PFAS in food. *See* 21 U.S.C. § 346.

100.    The FDCA does permit the limited use of PFAS in food contact applications, such as its use as a resin in forming gaskets, o-rings, and other parts of food processing equipment. This is due, in part, to the minimal risk of PFAS migrating from food processing equipment into the food itself.[43] However, as a result of studies which questioned the safety of long-chain PFAS such as PFOS, the FDA worked with manufacturers beginning in the early 2000s to discontinue the use of long-chain PFAS chemicals in food contact applications.[44] In 2016, the FDA revoked regulations authorizing the remaining use of PFOA in food contact applications. As of November 2016, long-chain PFAS like PFOA are no longer used in food

---

[43]   https://www.fda.gov/food/process-contaminants-food/authorized-uses-pfas-food-contact-applications (Last visited March 14, 2023)

[44] *Id*.

contact applications sold in the United States.[45]

101.   Accordingly, *there is no use of PFOA or PFOS that is currently permitted by the FDA.*

102.   Thus, regardless of the source of PFAS in the Products, it is nevertheless "adulterated" by virtue of the significant levels of toxic PFOS present.

103.   Under the FDCA, a food is deemed "misbranded" if "its labeling is false or misleading in any particular." *See* 21 U.S.C. § 343(a).

104.   The Products are misbranded because its labeling is false and misleading insofar as they purport to be, *inter alia*, "100% Fruit Juice Smoothie," yet do not disclose the presence of PFAS.

105.   Food that is deemed "adulterated" or "misbranded" may not be manufactured, distributed or sold in the United States. *See* 21 U.S.C. § 331. Adulterated and misbranded products thus have no economic value and are legally worthless.

106.   California has expressly adopted the federal food labeling requirements as its own. Thus, a violation of federal food labeling laws is an independent violation of California's Sherman Law and actionable as such.

107.   The mere presence of PFOS in the Products render them adulterated and misbranded.

108.   If Defendant had disclosed to Plaintiff and putative Class Members that the Products contained or risked containing PFAS and thus risked users to PFAS exposure, Plaintiff and putative Class Members would not have purchased the Products or they would have paid less for the Products.

109.   As a seller of a food product, Defendant had and has a duty to ensure that its Products did not and do not contain excessive (or any) level of toxic contaminants such as PFAS, including through regular testing, especially before the Products are injected into the stream of commerce for consumers to consume.

---

[45] *Id.*

110.    But based on Plaintiff's independent testing results set forth above, Defendant made no reasonable effort to test its Products for PFAS, despite representing to the public that it maintained comprehensive safety and quality control measures. Nor did it disclose to Plaintiff in any advertising or marketing that its Products contained PFAS, let alone at levels that are many multiples of the lifetime advisory limit set by the EPA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Product was a "100% Fruit Juice Smoothie", was of merchantable quality, complied with federal and state law, and did not contain dangerous substances such as PFAS.

**The Products Are Substantially Similar**

111.    The Products are substantially similar, in that they all have the same "100% Fruit Juice Smoothie," and "No added sugar"[46] representations on the product label.

112.    All of the representations by Defendant on the Products were uniform and mentioned nothing about the material amounts of PFAS within the Products.

113.    All of Defendant's marketing representations on the Products' are to make it seem as though it is a healthy fruit juice smoothie, where they cannot be missed by consumers such as Plaintiffs and proposed Class Members and Subclass members.

114.    All of the representations across all of the Products' labels are false for the same reason: the Products contain PFAS, a synthetic ingredient that renders the Product as a healthy "100 % Fruit Juice Smoothie".

## PLAINTIFFS' FACTUAL ALLEGATIONS

**Plaintiff Lakema Tate**

115.    Plaintiff Lakema Tate is a citizen and resident of the state of California.  As recently as January of 2023, Plaintiff Tate purchased and consumed Defendant's Green Goodness and Mango Cherry C-Boost product from a Target location in Los Angeles, California.

116.    Prior to her purchase, Plaintiff Tate reviewed the labeling, packaging, and

---

[46] With the exception of C-Boost.

COMPLAINT

marketing materials of the Products, including those set out herein.   Thus, Plaintiff Tate understood that based on Defendant's claims, the Products were a healthy juice beverage that was safe for use and human consumption, and was free of harmful, man-made chemicals like PFAS.  Plaintiff Tate reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products, or would not have purchased it on the same terms, if the true facts had been known.

117.    As a direct result of Defendant's material misrepresentations and omissions, Plaintiff Tate suffered, and continues to suffer, economic injuries.

118.    Plaintiff Tate continues to desire to purchase the Products from Defendant if she can rely on the Products to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendant's misrepresentations detailed herein, Plaintiff Tate is unable to determine if Defendant's Products are actually free of harmful chemicals like PFAS in the future. Plaintiff Tate understands that the composition of the Products may change over time, but as long as Defendant may freely advertise the Product as safe or healthy when it actually contains material levels of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Products and competitor's products, which do in fact contain only natural and nutritious ingredients and are free of PFAS.

***Plaintiff Richard Ortiz***

119.    Plaintiff Richard Ortiz is a citizen and resident of the state of Illinois. As recently as December of 2022, Plaintiff Ortiz purchased and consumed Defendant's Products that contained PFAS. More specifically, Plaintiff Ortiz purchased the Amazing Mango, Green Goodness, Blue Goodness, Mango Cherry C-Boost, and Berry Superfood Boost numerous times a month at a Walmart in Illinois for years prior to his last purchase in December of 2022.

120.    Prior to his purchase, Plaintiff Ortiz reviewed the labeling, packaging, and

- 24 -

marketing materials of the Products, including those set out herein. Thus, Plaintiff Ortiz understood that based on Defendant's claims, the Product was a healthy juice beverage that was safe for use and human consumption, and was free of harmful, man-made chemicals like PFAS. Plaintiff Ortiz reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased it on the same terms, if the true facts had been known.

121. As a direct result of Defendant's material misrepresentations and omissions, Plaintiff Ortiz suffered and continues to suffer, economic injuries.

122. Plaintiff Ortiz continues to desire to purchase the Products from Defendant if he can rely on that Products to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendant's misrepresentations detailed herein, Plaintiff Ortiz is unable to determine if Defendant's Products are actually free of harmful chemicals like PFAS in the future. Plaintiff Ortiz understands that the composition of the Products may change over time, but as long as Defendant may freely advertise the Products as safe or healthy when it actually contains material levels of PFAS, then when presented with false or misleading information when shopping, he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Product and competitor's products, which do in fact contain only natural and nutritious ingredients and are free of PFAS.

### INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM

123. Defendant's wrongful conduct harms the public-at-large.

124. PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

125. PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of

- 25 -

cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

126. Because Defendant's deceptive advertising is ongoing and directed to the public, and because Defendant continues to sell its Products containing PFAS chemicals, the deception poses an ongoing risk to the public.

127. As such, a public injunction must be provided in order to enjoin Defendant's continued harm of consumers and the public-at-large.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

128. Defendant had actual knowledge, or should have had actual knowledge, that its Products contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

129. Although Defendant was aware of the deception in their advertising, marketing, packaging, and sale of the Products given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiffs or Class Members that its Product contained PFAS chemicals.

130. Despite its knowledge, Defendant has fraudulently misrepresented the Producst as having qualities and characteristics it does not, while concealing the fact that its Products contain PFAS chemicals.

131. Defendant has made, and continues to make, affirmative false statements and misrepresentations to consumers, and continues to omit the fact that the Products contain PFAS, to promote sales of its Products.

132. Defendant has misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products. Defendant's misrepresentations and omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

133.    The PFAS chemicals in the design and/or manufacture of Defendant's Products were not reasonably detectible to Plaintiffs and Class Members.

134.    At all times, Defendant actively and intentionally misrepresented the qualities and characteristics of the Products, while concealing the existence of the PFAS chemicals and failing to inform Plaintiffs or Class Members of the existence of the PFAS chemicals in its Products. Accordingly, Plaintiffs' and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

135.    Defendant's statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Products contained artificial, man-made PFAS chemicals.

136.    Defendant misrepresented the Products and concealed the PFAS chemicals for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

137.    As a result of Defendant's intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiffs and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Products.

138.    Further, the causes of action alleged herein did not occur until Plaintiffs and Class Members discovered that the Products contained PFAS chemicals. Plaintiffs and Class Members had no realistic ability to discern that the Products contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence and true nature of the Products.

**FEDERAL RULE OF CIVIL POROCEDURE 9(B) ALLEGATIONS**

139.    Although Defendant is in the best position to know what content it placed on its packaging, website(s), and other marketing and advertising during the relevant timeframe, and

the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Products to Plaintiffs and consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

140. **WHO**: Defendant made its Representations and other representations on the Products' packaging, online, and its marketing and advertising of the Products.

141. **WHAT**: Defendant's conduct here was, and continues to be, deceptive and fraudulent because of its health-focused Nutrition Representations and other false representations. Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Products were manufactured and sold with the represented qualities. Defendant knew or should have known this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products as possessing qualities they do not have.

142. **WHEN**: Defendant made material misrepresentations, false statements and/or material omissions during the putative Class periods and at the time Plaintiffs and Class Members purchased the Products, prior to and at the time Plaintiffs and Class Members made claims after realizing the Products contained harmful man-made chemicals, and continuously throughout the applicable Class periods.

143. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Products' packaging, as well as on website(s) and other media channels used to market and advertise the Products.

144. **HOW**: Defendant made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Products.

145. **WHY**: Defendant made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Products over other brands that did not make similar health-focused representations, the effect of which was that Defendant profited by selling the Products to many thousands of consumers.

146.   **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Defendant's misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

147.   Plaintiffs bring this action individually and as the representative of all those similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and the members of the following class:

> **Nationwide Class**: During the fullest period allowed by law, all persons who purchased the Products within the United States for personal use and not for resale.

148.   Plaintiff Tate brings this action individually and as the representative of all those similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of herself and the members of the following class:

> **California Class:** During the fullest period allowed by law, all persons who purchased the Products within the State of California for personal use and not for resale.

149.   Plaintiff Ortiz brings this action individually and as the representative of all those similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of himself and the members of the following class:

> **Illinois Class:** During the fullest period allowed by law, all persons who purchased the Products within the State of Illinois for personal use and not for resale.

150.   Members of the classes described are referred to herein as "Class Members" or members of the "Class."

151.   Plaintiffs reserve the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

152.   The following are excluded from the Class: (1) any Judge presiding over this

action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

153.    **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiffs do not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Products nationally, the members of the Class are so numerous that their individual joinder herein is impracticable.  Plaintiffs are informed and believe that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

154.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

   a.    Whether Defendant misrepresented, omitted, and/or failed to disclose material facts concerning the Products;

   b.    Whether Defendant's conduct was unlawful; unfair; fraudulent and/or deceptive;

   c.    Whether Defendant breached express warranties to Plaintiffs and Class Members;

   d.    Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs

and the proposed Class;

e.   Whether Plaintiffs and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

155.   Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiffs seek to enforce on behalf of herself and the other Members of the proposed Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

156.   **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiffs' claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendant's uniform misconduct described herein. Further, there are no defenses available to Defendant that are unique to Plaintiffs or to any particular Members of the Class.

157.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are an adequate Class representative because his interests do not conflict with the interests of the other Members of the Class he seeks to represent; they have retained counsel competent and experienced in complex class action litigation; and they will prosecute this action vigorously.   The interests of the Class will be fairly and adequately protected by Plaintiffs and the undersigned counsel.

158.   **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy.   Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.   The proposed Classes thus

- 31 -

satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

159.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if Members of the Class could afford individual litigation, the court system could not.  Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### Violation Of Magnuson-Moss Warranty Act
### 15 U.S.C. § 2301, *et seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

160.   Plaintiffs repeat and re-allege all previous paragraphs, as if fully included herein.

161.   As previously alleged, this Court has original jurisdiction over this matter based upon the requirements of CAFA; therefore, the Court has alternate jurisdiction over Plaintiffs' Magnuson-Moss claim.

162.   The Products are a consumer product as defined in 15 U.S.C. § 2301(1).

163.   Plaintiffs and the Nationwide Class members are consumers as defined in 15 U.S.C. § 2301(3) and utilized the Products for personal and household use and not for resale or commercial purposes.

164.   Plaintiffs purchased the Products costing more than $5 and their individual claim is greater than $25 as required by 15 U.S.C. §§ 2302(e) and 2310(d)(3)(A).

- 32 -

COMPLAINT

165.    Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

166.    The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

167.    The MMWA provides a cause of action for breach of warranty, including the violation of express and implied warranty of merchantability, or other violations of the Act. 15 U.S.C. § 2310(d)(1).

168.    The Defendant has breached the implied warranties of merchantability by failing to provide merchantable goods. The Products at issue is not merchantable or fit for their ordinary purposes because the Products contains ingredients that contradict Defendant's uniform claims that the Product is a healthy, nutritious, safe juice drink that is free from artificial ingredients.

169.    Therefore, Defendant's Products are not merchantable or fit for its ordinary purposes given it contains man-made and synthetic PFAS and renders the product not nutritious or good for human health.

170.    The Defendant has violated the express warranty because despite claiming it the Products are "100% Fruit Juice Smoothie" containing numerous health and nutrition benefits, it contains detectable levels of PFAS chemicals. Hence, it breached the express warranty by making said representations.

171.    In its capacity as warrantor, and by the conduct described herein, any attempt by Defendant to limit the warranties in a manner that it does is not permitted by law.

172.    By Defendant's conduct as described herein, Defendant has failed to comply with their obligations under their implied promises, warranties, and representations.

173.    Plaintiffs and the Nationwide Class fulfilled their obligations under the implied warranties and express warranties for the Products.

174.    As a result of Defendant's breach of warranties, Plaintiffs and the Nationwide Class are entitled to revoke their acceptance of the Products, obtain damages, punitive damages, equitable relief, and attorneys' fees and costs pursuant to 15 U.S.C. § 2301.

- 33 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT II**
**Violation of the California Consumer Legal Remedies Act**
**("CLRA"), Civil Code §§ 1750, *et seq.***
**(On Behalf of Plaintiff and Tate and the California Class)**

175.    Plaintiff Tate brings this count on behalf of herself and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

176.    The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq*.

177.    The CLRA applies to all claims of all California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

178.    Plaintiff Tate and California Class Members are "consumers" as defined by Civil Code § 1761(d).

179.    Defendant is a "person" as defined by Civil Code § 1761(c).

180.    The Products qualifies as "goods" as defined by Civil Code § 1761(a).

181.    Plaintiff Tate and the California Class Members' purchases of the Products are "transactions" as defined by Civil Code § 1761(e).

182.    As set forth below, the CLRA deems the following **unfair** methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

(a)    "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

(b)    "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

(c)    "Advertising goods or services with intent not to sell them as

advertised." Civil Code § 1770(a)(9); and

(d)   "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

183.   Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it represented, through its advertising and other express representations, that the Products have benefits or characteristics that they did not actually have.

184.   As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA and has made representations regarding Products' benefits or characteristics that they did not in fact have, and represented the Products to be of a quality that was not true. Indeed, Defendant concealed this information from Plaintiff Tate and California Class Members.

185.   The mere presence of PFOS in the Products renders them adulterated and misbranded and in violation of the CLRA.

186.   The Products are not nutritious, healthy, or safe for human consumption, and therefore is of an inferior quality and trustworthiness compared to other products in the industry. As detailed above, Defendant further violated the CLRA when it falsely represented that the Products meets a certain standard or quality.

187.   As detailed above, Defendant violated the CLRA when it advertised the Products with the intent not to sell it as advertised and knew that the Products were not as represented.

188.   Specifically, Defendant marketed and represented the Products with the Nutrition Representations and other representations described herein, when in fact no reasonable consumer would believe the products to be nutritious, healthy, or "good" if they knew they contained a potentially harmful chemical such as PFAS.

189.   Defendant's deceptive practices were specifically designed to induce Plaintiff Tate and California Class Members to purchase or otherwise acquire the Products.

COMPLAINT

190.    Defendant engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the Products manufactured by Defendant. Defendant's packaging, advertising, marketing, website and retailer product identification and specifications, contain numerous false and misleading statements regarding the quality, safety, and reliability of the Products.

191.    Despite these Nutrition Representations, Defendant also omitted and concealed information and material facts from Plaintiff Tate and California Class Members.

192.    In their purchase of the Products, Plaintiff Tate and California Class Members relied on Defendant's representations and omissions of material facts.

193.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

In accordance with Civil Code § 1780(a), Plaintiff Tate and the other California Class Members seek injunctive and equitable relief for Defendant's violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

<u>**COUNT III**</u>
**Violations of the California Unfair Competition Law**
**("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff Tate California Class)**

194.    Plaintiff Tate brings this count on behalf of herself and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

195.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

196.    Plaintiff Tate and Class Members who purchased Defendant's Products suffered an injury by virtue of buying products in which Defendant misrepresented and/or omitted the Products' true quality, reliability, safety, and use. Had Plaintiff Tate and Class Members known that Defendant materially misrepresented the Products and/or omitted material information regarding the Products, they would not have purchased the Products.

197.    Defendant's conduct, as alleged herein, violates the laws and public policies of

COMPLAINT

California and the federal government, as set out in this complaint.

198.   There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its Products.

199.   Plaintiff Tate and Class Members who purchased Defendant's Products had no way of reasonably knowing that the Product was deceptively packaged, marketed, advertised, and labeled, was not safe for human consumption, and was unsuitable for its intended use as a juice beverage. Thus, Plaintiff Tate and California Class Members could not have reasonably avoided the harm they suffered.

200.   Specifically, Defendant marketed, labeled, and represented the Products with the Nutrition Representations and other representations described herein, when in fact the Products contains PFAS, which no reasonable consumer would believe was in products represented as "good," nutritious, healthy, and containing significant health benefits.

201.   The gravity of the harm suffered by Plaintiff Tate and Class Members who purchased Defendant's Products outweigh any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the Products in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff Tate and California Class Members.

202.   The mere presence of PFOS in the Products renders them adulterated and misbranded and in violation of the UCL.

203.   The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff Tate and Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's Products and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

204.   Defendant has violated the UCL's proscription against engaging in unlawful business practices as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of

- 37 -

California's False Advertising Law, in addition to breaches of warranty and violations of common law.

205.    Defendant has also violated the UCL's proscription against engaging in unfair business practices. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

206.    Defendant has further violated the UCL's proscription against engaging in fraudulent business practices. Defendant's claims, nondisclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

207.    Plaintiff Tate and the other Class Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

208.    Plaintiff Tate seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.

209.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiffs' desire to purchase the Products in the future if they can be assured that the Products are properly label and actually contain a virologist developed elderberry extract.

210.    Additionally, Plaintiff Tate seek restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be

adequate to address the injury suffered by Plaintiff Tate and other Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

211.   On behalf of the Class, Plaintiff Tate also seeks an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

**COUNT IV**
**Violation of the California False Advertising Law ("FAL")**
**California Business and Professions Code §§ 17500, *et seq.***
**(On Behalf of Plaintiff Tate and the California Class)**

212.   Plaintiff Tate brings this count on behalf of herself and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

213.   The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

214.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

215.   Specifically, Defendant marketed, labeled, and represented the Products with the Nutrition Representations and other misrepresentations described herein, when in fact the Products contain PFAS, which no reasonable consumer would believe was in products represented as "good," nutritious, healthy, and containing significant health benefits.

216.   At the time of its misrepresentations, Defendant was either aware that Products contained PFAS, which no reasonable consumer would expect would be in products with the Nutrition Representations, or was aware that it lacked the information and/or knowledge required to make such a representation truthfully. Defendant concealed and omitted and failed

to disclose this information to Plaintiff Tate and California Class Members.

217.   Defendant's descriptions of the Products were false, misleading, and likely to deceive Plaintiff and other reasonable consumers.

218.   The mere presence of PFOS in the Products renders them adulterated and misbranded and in violation of the FAL.

219.   Defendant's conduct therefore constitutes deceptive or misleading advertising.

220.   Plaintiff Tate has standing to pursue claims under the FAL as they reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding the Products when selecting and purchasing the Products.

221.   In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of the Products, Plaintiff Tate and California Class Members purchased the Products.

222.   Had Defendant disclosed the true nature of the Products (that it contain PFAS), Plaintiff Tate and California Class Members would not have purchased the Products or would have paid substantially less for it.

223.   Plaintiff Tate seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.

224.   Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Tate's desire to purchase the Products in the future if they can be assured that the Products are properly label and actually contain a virologist developed elderberry extract.

225.   Additionally, Plaintiff Tate seeks restitution if monetary damages are not available. Indeed, restitution under the FAL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff Tate and the Class. Unlike damages, the

Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

226.     On behalf of the Class, Plaintiff Tate also seeks an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

**COUNT V**
**Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, et seq. and California Commercial Code § 2314**
**(On Behalf of Plaintiff Tate and the California Class)**

227.     Plaintiff Tate brings this count on behalf of herself and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

228.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. et seq., and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

229.     The Products at issue here are "consumer goods[]" within the meaning of Cal. Civ. Code § 1791(a).

230.     Plaintiff Tate and the Class Members who purchased the Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

231.     Defendant is in the business of manufacturing and/or producing the Products and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

232.     Defendant impliedly warranted to retailer buyers that the Products were merchantable in that it would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used.

- 41 -

For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Product was unsafe for consumption due to its inclusion of PFAS. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

233.    The mere presence of PFOS in the Products renders them adulterated and misbranded and in violation of Cal. Civ. Code § 1790.

234.    Plaintiff Tate and Class Members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Products.

235.    The Products were not altered by Plaintiff Tate or the Class Members.

236.    The Products were defective at the time of sale. The issue as described in this complaint was latent in the products and not discoverable at the time of sale.

237.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiff Tate and Class Members.

238.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff Tate and Class Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that it was unfit for use and posed a significant safety risk.

239.    Plaintiff and the Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

**COUNT VIII**
**Violation Of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS § 505/1 et seq. ("ICFA")**
**(On Behalf of Plaintiff Ortiz and the Illinois Subclass)**

240.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though set forth fully herein.

241.    Plaintiffs bring this cause of action on behalf of themselves and Illinois Subclass Members against Defendants.

242.    Plaintiffs and other Class Members are persons, constituting consumers having

purchased the product for personal, family or household use under the ICFA.

243.    Defendants are persons under the ICFA, and at all times relevant hereto, Defendants were engaged in trade or commerce as defined by the ICFA.

244.    The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce…." , and prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in 815 ILCS § 505/2.

245.    Plaintiff Ortiz and the other Illinois Subclass Members reasonably relied upon Defendant's Nutrition Representations and therefore free from artificial or synthetic ingredients. Due to Defendants' omission of the presence of PFAS in the Product, Plaintiffs read and relied on Defendants' labeling to conclude that the Product was not contaminated with any unnatural or synthetic substances, including PFAS.

246.    The mere presence of PFOS in the Products renders them adulterated and misbranded and in violation of the ICFA.

247.    Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, et seq.

248.    Defendant violated the ICFA by representing that the Products have characteristics or benefits that it does not have, i.e., that the product was a "100% Fruit Juice Smoothie" when in fact it contains artificial, synthetic, man-made chemicals known to pose a hazard to human health.

249.    Defendant advertised the Products with intent not to sell it as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

250.    Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(3).

251.    Prior to placing the Products into the stream of commerce and into the hands of

- 43 -

consumers to use on their bodies, Defendant knew or should have known that the Products contained PFAS, but Defendants not only failed to properly test and quality-check its Products, but further misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class members, by not including PFAS or the risk of PFAS contamination on the Products' labels or otherwise warning of its presence.

252.    Defendants intended that Plaintiff Ortiz and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

253.    Given Defendant's position in the oral health market as an industry leader, Plaintiff Ortiz and reasonable consumers, trusted and relied on Defendant's representations and omissions regarding the presence of PFAS in the Products.

254.    Defendant's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff Ortiz and each of the other Illinois Subclass Members to be deceived about the true nature of the Products.

255.    Plaintiff Ortiz and Class Members have been damaged as a proximate result of Defendant's violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

256.    As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff Ortiz and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's misrepresentations and material omissions regarding the presence of PFAS in the Products. Had they been aware of the true nature of the Products, Plaintiff Ortiz and Class Members either would have paid less for the Products or would not have purchased them at all.

257.    Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff Ortiz and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorney's fees, under 815 ILCS 505/10a.

**COUNT IX**
**Breach Of Express Warranty**
**(On Behalf of Plaintiffs And The Nationwide Class)**

258.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

259.    Defendant is and was at all relevant times a "merchant" under U.C.C. § 2-313, and related State U.C.C. provisions.

260.    Plaintiffs and Class Members formed a contract with Defendant at the time Plaintiffs and Class Members purchased the Product.

261.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

262.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Class Members.

263.    As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption, and is a "good," healthy, nutritious, and natural 100% Fruit Juice Smoothie.

264.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

265.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs' and Class Members' decision to purchase the Product.

266.    Plaintiffs and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Product.

267.    The mere presence of PFOS in the Products renders them adulterated and misbranded and in violation of the Products' express warranties.

268.    Plaintiffs and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

COMPLAINT

269.    Defendant thereby breached the following state warranty laws:

a.      Code of Ala. § 7-2-313;

b.      Alaska Stat. § 45.02.313;

c.      A.R.S. § 47-2313;

d.      A.C.A. § 4-2-313;

e.      Cal. Comm. Code § 2313;

f.      Colo. Rev. Stat. § 4-2-313;

g.      Conn. Gen. Stat. § 42a-2-313;

h.      6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.    Nev. Rev. Stat. Ann. § 104.2313;

cc.    R.S.A. 382-A:2-313;

dd.    N.J. Stat. Ann. § 12A:2-313;

ee.    N.M. Stat. Ann. § 55-2-313;

ff.    N.Y. U.C.C. Law § 2-313;

gg.    N.C. Gen. Stat. § 25-2-313;

hh.    N.D. Cent. Code § 41-02-30;

ii.    Il. O.R.C. Ann. § 1302.26;

jj.    12A Okl. St. § 2-313;

kk.    Or. Rev. Stat. § 72-3130;

ll.    13 Pa. Rev. Stat. § 72-3130;

mm.    R.I. Gen. Laws § 6A-2-313;

nn.    S.C. Code Ann. § 36-2-313;

oo.    S.D. Codified Laws, § 57A-2-313;

pp.    Tenn. Code Ann. § 47-2-313;

qq.    Tex. Bus. & Com. Code § 2.313;

rr.    Utah Code Ann. § 70A-2-313;

ss.    9A V.S.A. § 2-313;

tt.    Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

## **PRAYER FOR RELIEF**

270.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing Plaintiffs as Class Representatives and appointing

- 47 -

Plaintiffs' counsel as Class Counsel;

(b) Directing that Defendant bear the costs of any notice sent to the Classes;

(c) Ordering Defendant to pay restitution to Plaintiffs and the Classes;

(d) A jury trial and damages according to proof;

(e) Awarding actual damages to Plaintiffs and the Classes;

(f) Awarding Plaintiffs and members of the Classes statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g) Awarding attorneys' fees and litigation costs to Plaintiffs and members of the Classes;

(h) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i) Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial of the claims asserted in this Class Action Complaint.

Dated: July 12, 2023                    Respectfully submitted,

_/s/ Trenton R. Kashima_

Trenton R. Kashima (SBN No. 291405)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

- 48 -

COMPLAINT

Jason P. Sultzer, Esq.
Daniel Markowitz, Esq.
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Gary Klinger*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
221 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Erin Ruben*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
hbryson@milberg.com

* *Pro Hac Vice* application forthcoming

*Attorneys for Plaintiffs and the Proposed Class*

- 49 -

COMPLAINT